UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

   - against -

RICHARD KURTZ,

             Defendant.

------------------------------------X

08 Cr. 402-01(RWS)

SENTENCING OPINION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4|3|09

**Sweet, D.J.**

On May 22, 2008, Richard Kurtz ("Kurtz" or "Defendant") pleaded guilty to one count of transmitting threats to injure the property and reputation of another in interstate or foreign commerce communications with intent to extort money in violation of 18 U.S.C. § 875(d).  For the reasons set forth below, Kurtz will be sentenced to 2 years probation.  Kurtz will also be required to pay a special assessment of $100.

**Prior Proceedings**

On September 27, 2007, Indictment 07 CR 399 (EWN) was filed in the District of Colorado.  It charges that from August 28, 2007, through September 18, 2007, in the State and District

1

of Colorado and elsewhere, Richard J. Kurtz, a/k/a Laurence Solomon, together with another, and with intent to extort money from Esther Kirsch, did transmit threats to injure the property and reputation of Kirsch in interstate or foreign commerce communications.

On May 7, 2008, pursuant to a Rule 20 proceeding, the Defendant was transferred to the Southern District of New York, and assigned docket number 08 CR 402 (RWS).

On May 22, 2008, Kurtz pleaded guilty to his criminal conduct as charged, before the Honorable Ronald L. Ellis, in accordance with a plea agreement.

Defendant's sentencing is scheduled for April 6, 2009 before the Honorable Robert W. Sweet.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through

2

consideration of all of the factors identified in 18 U.S.C. §
3553(a), including the advisory Sentencing Guidelines
("Guidelines") established by the United States Sentencing
Commission. Thus, the sentence to be imposed here is the result
of a consideration of:

> (1)  the nature and circumstances of the offense and
> the history and characteristics of the defendant;
>
> (2)  the need for the sentence imposed --
>
>> (A)  to reflect the seriousness of the offense,
>> to promote respect for the law, and to
>> provide just punishment for the offense;
>>
>> (B)  to afford adequate deterrence to criminal
>> conduct;
>>
>> (C)  to protect the public from further crimes of
>> the defendant; and
>>
>> (D)  to provide the defendant with needed
>> educational or vocational training, medical
>> care, or other correctional treatment in the
>> most effective manner;
>
> (3)  the kinds of sentences available;
>
> (4)  the kinds of sentence and the sentencing range
> established for --
>
>> (A)  the applicable category of offense committed
>> by the applicable category of defendant as
>> set forth in the guidelines ...;
>
> (5)  any pertinent policy statement ... [issued
> by the Sentencing Commission];
>
> (6)  the need to avoid unwarranted sentence
> disparities among defendants with similar

3

records who have been found guilty of
similar conduct; and

(7) the need to provide restitution to any victims of
the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find
all the facts appropriate for determining a sentence, whether
that sentence is a so-called Guidelines sentence or not. See
Crosby, 397 F.3d at 114-15.

In light of the Court's statutory responsibility "to
'impose a sentence sufficient, but not greater than necessary'
to accomplish the goals of sentencing," Kimbrough v. United
States, 128 S. Ct 558, 571 (2007) (quoting 18 U.S.C. § 3553(a)),
and having considered the Guidelines and all of the factors set
forth in § 3553(a), it is determined that a Guidelines sentence
is warranted in the instant case.

**The Defendant**

The Court adopts the facts set forth in the Probation
Department's Presentence Investigation Report ("PSR") with
respect to Kurtz's personal and family history.

4

**The Offense Conduct**

The following description draws from the PSR. The specific facts of the underlying conduct are adopted as set forth in that report.

On August 30, 2007, Esther Kirsch, a 62-year-old resident of Denver, Colorado, appeared at the Denver office of the FBI and told agents that she was being threatened via phone and e-mail by an individual whom she knew as "Laurence Solomon," subsequently identified as Richard Kurtz. Kirsch told the FBI agents that she met a man claiming to be "Laurence Solomon" through an online internet Jewish dating service, and that she had been communicating with him over the Internet for the past three months.

Kirsch further told agents that on August 15, 2007, Kurtz came to Denver to stay with her for a few days. Shortly before August 28, 2007, while he was still visiting, Kurtz began taking pictures of Kirsch, reportedly without her permission, while she was taking a shower and while she was lying on her bed. Kirsch reportedly asked Kurtz to give her the camera and film; however, Kurtz refused.

5

Kirsch further reported to agents that on August 28, 2007, Kurtz announced that he was leaving Denver because Kirsch "annoyed him." Kirsch then drove Kurtz to Denver International Airport that evening, where she believed he took an 11:30 p.m. flight to Newark, NJ.

Kirsch also related to agents that after Kurtz was on the plane, she recalled that he had not given her the photos. Consequently, she sent him an e-mail when she arrived at home requesting the photos. The e-mail reply she received from Kurtz included the following:

You owe me $750 . . . I do hope you re-pay me promptly as I responded promptly to your request Tuesday evening . . . I presume you can be trusted to comply please send a MONEY ORDER for $750 . . . to Art Lieber 145-15 Rockaway Boulevard Neponsit-Queens, NY 11694 in left hand corner of envelope . . . ATTN: Laurence (sic).

The reply e-mail also mentioned associates of Kirsch, and stated "maybe I'll drop them a line."

Kurtz sent another e-mail to Kirsch on August 30, 2007, that included the following statements: "Do not

6

underestimate my anger because if you can rationalize what you did, then I can justify a few calls, faxes, emails etc . . . waiting to be reimbursed before I express my unhappiness."

Kirsch also provided agents with a compact disc which contained recordings from her voicemail account. In a voicemail received by Kirsch on August 27, 2007, a man, whose voice Kirsch identified as that of Kurtz, stated that she should pay him the $500 that he was owed and listed friends and associates of the Kirsch whom he might contact.

Specifically, Kurtz stated, "[i]f I pay $10 for this, what am I getting? And if I don't pay $10 for this, what am I losing? You're a good businesswoman, you have told me. So, I'm sure you'll come up with the right answer. Don't shoot from the hip, it's not a good idea. Not when you're playing with a chess champion." Kurtz also informed Kirsch that she should cut her losses "or the losses will only increase." Kurtz then added, "[y]ou never know who's smarter than you. And, uh, who could do things. Is it worth it? You've got to ask yourself sometimes." Kurtz then stated, "I'll send you an e-mail and tell you where to send a check for $500."

7

In a voicemail received by Kirsch on August 28, 2007, Kurtz stated that "the Israeli military doesn't react when it's expected. They react when they decide it's the right time." The Defendant also stated, "[i]f I were you, I'd think very carefully before you act or do anything." Kurtz ended the call by stating, "[y]ou do owe me $750 for the tickets. We'll talk about that."

In a voicemail received by Kirsch on August 29, 2007, Kurtz stated that he would get the address for Temple Sinai on his own. He also stated that he would wait until 11:00 New York City time. Kurtz then listed the names of the Kirsch's associates for whom he had addresses.

In a voicemail received by Kirsch on August 29, 2007, Kurtz stated: "Hopefully you will learn that, uh, a promise is something to be appreciated and you too will be prompt and can avoid a lot of heartache when you are prompt. I forgot to wish Rabbi Rheins a Happy New Year." Kurtz then adds, "[m]aybe I'll still do it. Take care, dear."

On September 5, 2007, Kirsch sent an e-mail to Kurtz, which included the following:

8

We both know how damaging it would be if any of the pictures you took of me got out to any friends or especially my Rabbi.  My business reputation, as well as the reputation of my partners, would be extremely tarnished and even possibly destroyed if any of those photos surfaced to any of my manufacturers.   I would be happy to give you a one time payment in exchange for the pictures and negatives and the certainty that all copies have been destroyed.  Please get back to me as soon as I need to get on with my life and I'm sure you do also.

On September 5, 2007, Kirsch received the following e-mail from Kurt in response to her e-mail:

I am not in the same rush as you are – there are those who have suffered and become sensitive as they learn how it hurts . . . I cannot feel sorry for you and maybe you need to fell (sic) what you so easily do to others . . . if your mother was half as decent as you say . . . you were spitting on her grave and saying that her hopes for you were not realized . . . you may have to leave Denver ??  Isn't that too bad . . . at least you will have more time to prepare for it . . . it's Temple Sinai.org isn't it.

Kirsch then explained to agents that the website of the Jewish temple was meant as a reference to the Rabbi to whom Kurtz had threatened to send the nude photos.

On September 6, 2007, Kirsch provided FBI agents with two pages of a facsimile that she had received from Kurtz on

9

September 5, 2007. The first page contained a photo depicting Kirsch in the nude with her head turned and a copy of her business card. Written across the top of the page is "You're lying about my things." The second facsimile page contained another nude photo of Kirsch. Next to this photo were 26 smaller photos of poor quality of a nude female, with the label "Processed 31-Aug-2007."

Between September 7 and September 10, 2007, Kirsch continued to receive faxes which depicted her in the nude and e-mails threatening to release the photos to her associates unless she sent money to Kurtz.

On September 4, 2007, Kirsch provided agents with Kurtz's New York address and telephone number. Kurtz's address was subsequently confirmed by agents who spoke with the managing agent at Kurtz's apartment building. Case agents also learned that Kurtz had previously been convicted of bankruptcy fraud in the Southern District of New York. Agents forwarded a booking photo taken of Kurtz on November 25, 1998, to the Kirsch, who positively identified Kurtz as the man she knew as "Laurence Solomon."

10

On September 12, 2007, agents executed a search warrant at Kurtz's apartment. At the apartment, agents recovered, among other items, nude photographs of the Kirsch. Additionally, at that time, agents spoke with Kurtz, who confessed to having taken the nude photographs of the Kirsch and having threatened to disclose the photographs to others if she failed to pay him money. The Defendant also admitted to having used the name "Laurence Solomon" in his communications with the Kirsch and others.

**The Relevant Statutory Provision**

Pursuant to 18 U.S.C. § 875(d), the maximum term of imprisonment is 2 years.

A term of supervised release of not more than one year may be imposed if a term of imprisonment is imposed, pursuant to 18 U.S.C. § 3583(b)(3).

The Defendant is eligible for not less than one and not more than five years probation by statute, pursuant to 18 U.S.C. § 3561(c)(1).

11

The maximum fine is $250,000, pursuant to 18 U.S.C. §
3571. A special assessment of $100 is mandatory, pursuant to 18
U.S.C. § 3013.

**The Guidelines**

The November 1, 2008 edition of the United States
Sentencing Commission Guidelines Manual has been used in this
case for calculation purposes, pursuant to § 1B1.11(a).

The guidelines for the violation of 18 U.S.C. § 875(d)
are covered by § 2B3.2 and § 2B3.3 of the Guidelines. However,
it appears that § 2B3.3 (Blackmail and Similar Forms of
Extortion) is more analogous to the Defendant's criminal
conduct. As such, the base offense level is 9, pursuant to §
2B3.3(a).

Because Kurtz has shown recognition of responsibility
for the offense, the offense is reduced two levels pursuant to §
3E1.1(a).

Accordingly, the applicable offense level is 7.

12

On November 25, 1998, Kurtz was arrested for
Bankruptcy Fraud. On July 13, 1999, Kurtz pleaded guilty, and
on November 19, 1999, was sentenced to 3 years' probation, with
special conditions of 6 months' home confinement and a $2,000
fine. Pursuant to §§ 4A1.1(c) and 4A1.2(e)(2), this conviction
warrants one criminal history point.

Accordingly, the Defendant has one criminal history
point and a Criminal History Category of I, pursuant to the
table at Chapter 5, Part A of the Guidelines.

Based on a total offense level of 7 and a Criminal
History Category of I, the Guidelines range for imprisonment is
0 to 6 months.

The Guidelines range for a term of supervised release
is one year, pursuant to § 5D1.2(a)(3). If a sentence of
imprisonment of one year or less is imposed, a term of
supervised release is not required but is optional, pursuant to
§5D1.1(b). Supervised release is required if the Court imposes
a term of imprisonment of more than one year or when required by
statute, pursuant to §5D1.1(a).

13

The Defendant is eligible for probation because the applicable guideline range is in Zone A of the Sentencing Table, pursuant to § 5B1.1(a)(1). Given an offense level of seven, if the Court imposes probation, the term must be at least one year but not more than five years pursuant to § 5B1.2(a)(1)

The fine range for the instant offense is from $500 to $5,000 pursuant to § 5E1.2(c)(3)(A) and (c)(4). Subject to the Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,076.83 to be used for imprisonment, a monthly cost of $301.80 for supervision, and a monthly cost of $1,905.92 for community confinement.

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) in order to impose a sentence "sufficient, but not greater than necessary," as is required in

14

accordance with the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103. Pursuant to all of the factors, imposition of a Guidelines sentence is warranted.

**The Sentence**

For the instant offense, Kurtz will be sentenced to 2 years probation.

Kurtz is directed to report to the nearest United States Probation Office within seventy-two hours of sentencing to commence a two-year term of supervised release. It is recommended that Kurtz be supervised by the district of his residence.

As mandatory conditions of his supervised release, Kurtz shall: (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; and (4) cooperate in the collection of DNA as directed by the probation officer.

Furthermore, the standard conditions of supervision

15

(1-13), set forth in the judgment, shall be imposed.

In consideration of all the factors set forth in 18 U.S.C. § 3572(a), it does not appear that the Defendant is able to pay a fine, and so the fine in this case shall be waived.  A special assessment of $100, payable to the United States, is mandatory and shall be due immediately.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for April 6, 2009.

It is so ordered.

New York, NY
April  7  , 2009

ROBERT W. SWEET
U.S.D.J.

16